# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-2003

_____

Kevin D. Cowden

*Plaintiff - Appellant*

v.

BNSF Railway Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 13, 2012
Filed: September 4, 2012

_____

Before MELLOY, SMITH, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Kevin D. Cowden sustained injuries while riding in a locomotive operated by his employer, BNSF Railway Company. Cowden brought suit seeking compensation under the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51 et seq. The district court concluded that relevant regulations promulgated under the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20101, et seq., provided the sole duty of care owed to Cowden in relation to his claim. The district court ruled that Cowden

had not demonstrated a failure to comply with the relevant regulations and that Cowden had therefore failed to establish a breach in BNSF's duty of care under the FELA, and therefore granted summary judgment for BNSF. Because the district court granted summary judgment on an issue not raised or discussed by either party, we reverse and remand for further proceedings. We also reverse in part the district court's order excluding expert testimony, because BNSF has not met its burden of showing that FRSA regulations substantially subsume Cowden's claim. We affirm that order in part because the district court correctly excluded other portions of the expert's testimony as prohibited by Rule 47 of the Federal Rules of Evidence.

## I. Facts

Kevin Cowden was employed by BNSF as a locomotive conductor. On January 14, 2008, Cowden was riding a BNSF locomotive near Springfield, Missouri. Cowden asserts that, somewhere between mile markers 151.4 and 151.8, the train bottomed out, throwing him several feet in the air. When Cowden landed, he suffered injuries to his back and neck. Cowden's injuries have rendered him unable to return to work for BNSF. At the time of his injury, Cowden was forty-one years old and had worked for the railway company for thirteen years.

On the day Cowden sustained his injuries, the portion of the track at issue was under a "slow order," which was a self-imposed order by the railway company permitting trains to travel no faster than forty miles per hour over that stretch of track. Without the slow order, BNSF's trains would normally have traveled sixty miles per hour over the track. It is undisputed that the train was traveling slower than forty miles per hour at the time of the incident. The parties disagree as to the actual reason for the slow order in place at the time of the accident; however, BNSF business records indicate that it was in place due to "tie conditions." The same section of track had previously been subject to additional slow orders due to various other conditions, such as "rough track" and "washouts."

BNSF records indicate that in April 2007, rough track surface caused BNSF to limit trains to forty miles per hour over this area. On May 1, 2007, BNSF lowered that limit to twenty-five miles per hour because of disturbed ballast, which affected the lateral stability of the rails. On May 23, 2007, records indicate that the twenty-five-mile-per-hour order was due to inadequate crosstie conditions, and the speed restriction was lifted on May 29. On September 9, 2007, a washout caused by heavy rainfall removed ballast between crossties, and BNSF again placed a twenty-five-mile-per-hour limit on the area. On November 2, 2007, BNSF raised the speed limit on this area of track, but maintained a forty-mile-per-hour limit. The records indicate the reason for this was because of inadequate condition of the crossties. This forty-mile-per-hour speed limitation remained in place until Cowden's accident. Because of Cowden's accident, BNSF again lowered the maximum speed to twenty-five miles per hour on January 14, 2008, and BNSF records listed tie conditions as the reason. At no point between May 2007 and the day of Cowden's accident were the railroad ties replaced.

Cowden brought suit in federal court alleging that BNSF is liable for his injuries under the FELA for negligently failing to provide him with reasonably safe working conditions.[1] Cowden's claim relies heavily on the BNSF records that he

---

[1]Cowden's suit also alleged that BNSF failed to provide reasonably safe equipment in violation of the FELA and that BNSF violated Locomotive Inspection Act (LIA) regulations. Under the FELA, violating LIA regulations would constitute negligence per se. Kernan v. American Dredging Co., 355 U.S. 426, 439 (1958). Cowden also alleged a separate claim that BNSF was strictly liable under the LIA for its violation of those regulations. Because Cowden failed to come forward with any evidence that the condition or operation of BNSF's train caused his injuries, the district court granted summary judgment for BNSF on Cowden's FELA claim with respect to alleged LIA violations. In addition, because the LIA does not provide an independent cause of action for personal injuries, the district court granted summary judgment for BNSF on Cowden's strict liability claim. Cowden does not challenge either ruling on appeal.

alleges indicate persistent, unremedied problems with the track in question. However, BNSF submitted testimony from its corporate representative, Joseph Thornburg, that questioned the accuracy of these business records. Thornburg testified that he believed BNSF's records were incorrect and that tie conditions had never really been a reason for the slow orders in place. Noting inconsistencies in the reasons for successive slow orders, Thornburg suggested that the record indicating tie-condition problems on May 23, 2007, may have been incorrect, and that the real reason may have been track-surface conditions. Thornburg also testified that he had an opportunity to look at geometry car data readings from early November 2007. Thornburg testified that the geometry data indicated that there was no evidence of any adverse track conditions. This data was never offered into evidence. When asked why a slow order of forty miles per hour remained in place if there were, in fact, no adverse track conditions, Thornburg stated that he didn't

> know what the ties actually looked like and, you know, I can look at the data on the geometry car as far as the surface and that, and it looks great, but as far as the actual physical appearance of the ties, [I] don't know what they looked like in the field, and that would be the judgment of the track foreman.

Thornburg Dep. 53:25–54:7, Jan. 19, 2010.

Cowden also offered the expert testimony of Alan Blackwell, a railway consultant who prepared a report concerning BNSF's maintenance of the track. Blackwell stated that after reviewing the track and BNSF records, he believed the railway company violated internal and industry standards of care and therefore failed to provide Cowden with a reasonably safe work environment. BNSF moved to exclude Blackwell's testimony for a variety of reasons, most of which were rejected by the district court. However, the court expressed concerns about the factual foundation and methodology underlying Blackwell's conclusions because his report did not cite to specific facts from the documents he reviewed and did not explain how

his methodology specifically led to his conclusions. The court "ultimately [found] that these are matters to be addressed at trial." Order of Aug. 19, 2010, at 5. The district court noted that Blackwell could not testify that BNSF violated federal safety regulations, as that would be an impermissible legal conclusion. The court acknowledged, however, that Blackwell could still opine generally about the prudence of BNSF's maintenance efforts and whether they provided a safe work environment.

The district court granted in part BNSF's motion to exclude with respect to two issues. First, the district court ruled that Blackwell would not be permitted to testify about possible negligence relating to train speed. Citing cases from the Fifth, Sixth, and Seventh Circuits that held FELA negligence claims were precluded when an employer was in compliance with FRSA regulations covering the same subject matter, the district court concluded that Blackwell could not testify about negligent speed because it was "undisputed that the train was traveling within the FRSA-mandated speed limit." Id. at 7.[2] Second, the district court ruled that Blackwell could not testify about repairs BNSF undertook on the section of track in question soon after Cowden's accident. Federal Rule of Evidence 407 bars evidence of subsequent remedial measures when used to prove negligence, and the district court concluded that was the purpose for which it was offered in the present case.

_____

[2]The parties do not appear to have discussed the specific operation of FRSA speed regulations before the district court. Although it is undisputed that the train was traveling under the limit of BNSF's self-imposed slow order, the Federal Railroad Association (FRA), which promulgates regulations under the FRSA, does not purport to impose "mandatory" speeds on railroads. The "FRA has never assumed the task of setting train speed. Rather, the agency holds railroads responsible for minimizing the risk of derailment by properly maintaining track for the speed they set themselves." Federal Railroad Administration, Track Safety Standards, 63 Fed. Reg. 33992-01, 33999 (June 22, 1998); see 49 C.F.R. § 213.9 (designating maximum speeds allowed over different classes of track).

BNSF filed a motion for summary judgment on June 11, 2010. BNSF's motion argued that Cowden failed to show that BNSF knew or should have known about any unsafe condition, that he failed to show his injuries were caused by any act or omission by BNSF, or that the harm was reasonably foreseeable. In support of its motion, BNSF pointed to Cowden's own testimony that he had never encountered any problems over the section of track in question, despite passing over it hundreds of times.[3] Neither BNSF's motion, nor its brief in support of that motion, mentioned any federal safety regulations.

The district court granted BNSF's motion on September 7, 2010, concluding that there was no genuine issue of material fact as to whether BNSF breached a duty of care owed to Cowden. Although BNSF had made no argument about federal safety regulations relating to its duty of care, the district court reasoned that the duty owed "under the FELA becomes somewhat more complex when one considers the applicability of [FRSA] regulations to a given situation, in that the question arises as to whether compliance with applicable FRSA safety regulations precludes a finding that the railroad has been negligent for purposes of the FELA." Order of Sept. 7, 2010, at 6–7. In this case, the district court concluded that there were FRSA regulations that permitted railroads to operate trains under slow orders and that these regulations "protect against precisely the sort of injury Plaintiff allegedly suffered." Id. at 8. The district court cited to four separate FRSA regulations that deal with train speeds in different contexts and stated that "these regulations concerning slow orders, and presumably others, directly address the harm that ultimately resulted." Id. The district court therefore concluded that Cowden could not establish a successful FELA claim based on the speed of the locomotive over allegedly defective track.

[3]BNSF's statement of uncontroverted facts supporting its motion consisted only of statements from Cowden's testimony. In its response to Cowden's statement of contested facts, BNSF offered Thornburg's deposition as evidence that BNSF had no notice of any track defect. Cowden did not have an opportunity to address BNSF's reply before the grant of summary judgment.

FRSA regulations supply Defendant's duty of care with respect to permitting trains to travel on allegedly defective or substandard track under slow orders, and there is no evidence in the record indicating that Defendant's decision to allow Plaintiff's locomotive to travel on the track in question under a slow order was in violation of such regulations.

Id. at 11.

On October 4, 2010, Cowden filed a 59(e) motion to amend or alter the judgment, arguing that the district court had improperly granted summary judgment on grounds not offered by BNSF and that the court failed to view the record in a light favorable to the non-moving party. Cowden argued that FRSA preclusion had not been briefed or argued by either party and that it was inappropriate to give preclusive effect to FRSA regulations in an FELA claim. In the alternative, Cowden argued that if violations of FRSA regulations were required for his claim to proceed, he could establish multiple violations by BNSF. Furthermore, Cowden argued that when viewed in a light favorable to the non-moving party, the record contained sufficient evidence to meet the low threshold required for FELA negligence claims.

The district court denied Cowden's motion on April 13, 2011. The district court stated that it

did *not* find that Plaintiff's FELA negligence claim was precluded by FRSA regulations, nor did it conclude that FRSA regulations provide a railroad's minimum duty of care for *every* FELA negligence claim. Plaintiff was only asserting that Defendant was negligent with respect to two related matters—operating the locomotive at an excessive speed and under poor track conditions, and the Court narrowly concluded that because specific FRSA regulations govern railroad speed limits and track conditions, those regulations supplied the standard of care for Plaintiff's FELA negligence claim.

Order of Apr. 13, 2010, at 2. Furthermore, the district court stated that, even if it did not find the FRSA regulations controlled the case, Cowden's negligence claim could not survive summary judgment because he had not established that his accident was reasonably foreseeable. The district court placed emphasis on the fact that Cowden had never experienced any problems with the track in question over the six months preceding the accident. The district court also found that there were no adverse track conditions two months before the accident occurred, citing the track geometry car data mentioned in Thornburg's testimony.

## II. FRSA Preclusion

In order to determine how federal safety regulations impact Cowden's claim, we must first examine the interplay between the FELA and the FRSA. Although other federal courts have drawn differing conclusions about the relationship between these two federal statutes, it is an issue of first impression before this Court.

## A. Background

Enacted in 1908, the FELA provides railroad employees with a federal cause of action for injuries "resulting in whole or in part from the negligence" of the railroad. 45 U.S.C. § 51. "The FELA imposes upon employers a continuous duty to provide a reasonably safe place to work." Francisco v. Burlington N. R.R. Co., 204 F.3d 787, 789 (8th Cir. 2000) (internal quotation marks omitted). "Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the 'human overhead' of doing business from employees to their employers." Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 542 (1994) (quoting Tiller v. Atl. Coast Line R. Co., 318 U.S. 54, 58 (1943)). "In order to further FELA's humanitarian purposes," Congress removed various common-law obstacles to an employee's recovery, id., and courts have "liberally construed FELA to further Congress'[s] remedial goal," id. at 543.

-8-

Enacted in 1970, the FRSA's stated purpose was to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA permits the Secretary of Transportation to "prescribe regulations . . . for every area of railroad safety." 49 U.S.C. § 20103(a).[4] The FRSA states that "[l]aws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). To maintain this uniformity, the FRSA contains an express preemption clause. This preemption clause allows for some coordination between state and federal regulation, providing that "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2).

In CSX Transp., Inc. v. Easterwood, 507 U.S. 658 (1993), the Supreme Court further defined what it means for a regulation to "cover" the same "subject matter of the State requirement." The Court explained that, where an FRSA regulation "substantially subsumes" the subject matter of a state law negligence claim, the claim is preempted. Id. at 664. In Easterwood, a truck driver's widow brought a negligence claim against a railroad company after her husband was killed in a collision with a train at a crossing. The widow argued that the train was traveling too fast and that the railroad company should have maintained warning devices at the crossing. Although the Court found the warning-device claim was not preempted by general federal mandates about grade-crossing improvements, id. at 667–68,[5] it concluded that the

---

[4]The Secretary has delegated this authority to the FRA. Union Pac. R.R. Co. v. Cal. Pub. Utils. Comm'n, 346 F.3d 851, 858 n.8 (9th Cir. 2003).

[5]The Court did find that one crossing regulation involving federal funds for warning devices had preemptive effect, but it did not apply to the facts in Easterwood. 507 U.S. at 671–673. The Court later found a similar claim preempted under this same provision in Norfolk S. Ry. Co. v. Shanklin, 529 U.S. 344, 353 (2000).

FRSA regulations relating to train speed preempted the widow's state negligence claim, id. at 676. Because the plaintiff was arguing merely that the "train was traveling too quickly given the 'time and place,'" her claim was substantially subsumed by the Secretary's adoption of 49 C.F.R. § 213.9, which allowed railroads to determine maximum speeds based on the condition or "class" of track over which trains traveled. Id. at 675 & n.15.

## B. Federal preclusion

Easterwood did not address how the FRSA interacted with federal negligence claims under the FELA, and the Supreme Court has yet to address the issue. Three other circuits, however, have used Easterwood as a guide in holding that FRSA regulations preclude federal tort claims under the FELA. See Nickels v. Grand Trunk Western R.R., Inc., 560 F.3d 426, 430 (6th Cir. 2009); Lane v. R.A. Sims, Jr., Inc., 241 F.3d 439, 443 (5th Cir. 2001); Waymire v. Norfolk & W. Ry. Co., 218 F.3d 773, 776 (7th Cir. 2000).[6] Two of these cases, Waymire and Lane, specifically dealt with the preclusive effect of 49 C.F.R. § 213.9 on excessive-speed claims brought under the FELA.

In Waymire, the Seventh Circuit reviewed an employee's FELA claim based on similar facts to those in Easterwood. After allegedly suffering post-traumatic stress from an automobile collision at a crossing, the employee argued that the railroad negligently allowed his train to travel at an unsafe speed—even though it was traveling below the FRSA-determined speed limit—and failed to install proper warning devices at the crossing. The Seventh Circuit noted, however, that it would "seem absurd to reach a contrary conclusion [to Easterwood] in this case when the

_____

[6]A fourth circuit has acknowledged these cases, but stopped short of endorsing their approach to preclusion. Tufariello v. Long Island R.R. Co., 458 F.3d 80, 86 (2d Cir. 2006).

-10-

operation of both trains was identical and when the Supreme Court has already found that the conduct is not culpable negligence." 218 F.3d at 776. Reviewing the warning-device claim, the court similarly concluded that allowing "a plaintiff to argue adequacy of warning claims under FELA but not under state law would undermine the railroad safety uniformity intended by Congress and we decline to do this." Id. at 777.

In Lane, the FELA plaintiff argued that FRSA regulations did not preclude his claim because the FRSA set only minimum safety requirements. The court rejected this argument, citing the explanation in Easterwood that the FRSA not only established a ceiling for permissible train speeds, but also precluded states from imposing lower ceilings. 241 F.3d at 443. Lane embraced the reasoning in Waymire that uniformity required courts to treat claims brought under federal law the same as claims brought under state law.

> Dissimilar treatment of the claims would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless: The railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA with respect to other classes of plaintiffs for the very same conduct.

Id. (internal quotation marks omitted).

We have previously noted that the FRSA—and in particular, its speed regulations—were adopted to address the patchwork effect of each state applying its own set of regulations. See Duluth, Winnipeg, & Pac. Ry. Co. v. City of Orr, 529 F.3d 794, 800 (8th Cir. 2008). To this extent, it is not clear how negligence claims brought under the federal common law threaten the uniformity sought by the FRSA. See Urie v. Thompson, 337 U.S. 163, 174 (1949) ("What constitutes negligence for the statute's purposes is a federal question, not varying in accordance with the

-11-

differing conceptions of negligence applicable under state and local laws for other purposes. Federal decisional law formulating and applying the concept governs."); Infermo v. New Jersey Transit Rail Operations, Inc., 2012 WL 209359 at *6 (D.N.J. Jan. 24, 2012) (unpublished) ("[T]he language of FRSA itself gives no indication that the express preemption clause crafted to address potentially varying and disparate state laws concerning standards for the operation and maintenance of the national rail system should, by implication, extend to subsume matters governed by FELA, which is concerned primarily with providing injured railroad employees a deliberately attainable remedy."). However, it appears that many lower courts have adopted our sister circuits' view that the FRSA can only achieve its desired uniformity if federal negligence claims are treated the same as state negligence claims. See, e.g., McCain v. CSX Transp., Inc., 708 F. Supp. 2d 494, 501–04 (E.D. Pa. 2010); Davis v. Union Pac. R.R. Co., 598 F. Supp. 2d 955, 956–60 (E.D. Ark. 2009); Booth v. CSX Transp., Inc., 334 S.W.3d 897, 900–01 (Ky. Ct. App. 2011); DeHahn v. CSX Transp., Inc., 925 N.E.2d 442, 450 (Ind. Ct. App. 2010). But see Grimes v. Norfolk S. R. Co., 116 F. Supp. 2d. 995, 1003 (N.D. Ind. 2000) ("There is also nothing in the language or legislative history of any enactment, including FRSA, that indicates the serious purpose of undermining the basic core of FELA and its essential purposes. Neither has the Supreme Court, nor for that matter any decision of the Circuit Courts of Appeal, indicated a basic hostility to the legislative purpose embedded in FELA, now or in the past."); Earwood v. Norfolk S. Ry. Co., 845 F. Supp. 880, 891 (N.D. Ga. 1993) (pre-Waymire case concluding that Easterwood's analysis of state preemption did not mandate federal preclusion of FELA claims); Myers v. Illinois Cent. R.R. Co., 753 N.E.2d 560, 565 (Ill. App. Ct. 2001) (rejecting Waymire's application of Easterwood to FELA claims)

We are mindful that the Supreme Court has cautioned that the FELA should not be cut down "by inference or implication." See Urie, 337 U.S. at 186. We are also mindful that the Supreme Court has acknowledged "the presumption against pre-emption" in the "relatively stringent standard" of § 20106(a) (formerly 45 U.S.C.

§ 434), and that FRSA regulations have "no affirmative indication of their effect on negligence law." Easterwood, 507 U.S. at 668. However, the Supreme Court has thus far declined to review our sister circuits' application of § 20106(a) to the issue of federal preclusion.

> Although we are not bound by another circuit's decision, we adhere to the policy that a sister circuit's reasoned decision deserves great weight and precedential value. As an appellate court, we strive to maintain uniformity in the law among the circuits, wherever reasoned analysis will allow, thus avoiding unnecessary burdens on the Supreme Court docket.

United States v. Auginash, 266 F.3d 781, 784 (8th Cir. 2001) (quoted from Aldens, Inc. v. Miller, 610 F.2d 538, 541 (8th Cir. 1979)). We decline to create a circuit split on this issue, in part because the issue was not properly raised below and the current record does not accurately demonstrate how preclusion might apply in Cowden's case. Even if we assume that the express preemption clause in 49 U.S.C. § 20106(a)(2) can be applied in some cases to preclude federal laws, we do not believe that it was properly applied in the current case.

### III. Improper Grant of Summary Judgment

The district court erred by addressing the dispositive nature of FRSA regulations for the first time in its order granting summary judgment.[7] The record below was not developed with the dispositive nature of FRSA regulations in mind,

---

[7]We acknowledge that the issue of preclusion was discussed earlier in BNSF's motion to bar Cowden's expert's testimony. However, the district court's order on that issue only addressed the specific context of Blackwell's conclusions about the speed of the train. An argument that FRSA regulations set the standard of care for Cowden's entire negligence suit was never raised, nor even alluded to, by BNSF prior to the court's summary judgment order.

and thus neither party has advanced evidence that was directly relevant to the conclusions the court ultimately formed. The incomplete summary judgment record requires remand for two reasons.

First, BNSF had the burden to show § 20106(a)(2) applied to Cowden's claim at the summary judgement stage. See Duluth, Winnipeg & Pac. Ry. Co., 529 F.3d at 797 ("It is the burden of the party advocating preemption under § 20106(a)(2) to show that a federal law, regulation, or order covers the same subject matter as the state law, regulation, or order it seeks to preempt."). Preclusion analysis, like the Supreme Court's preemption analysis under § 20106(a)(2), requires consideration of whether an FRSA regulation "substantially subsumes" the negligence claim. See Nickels, 560 F.3d at 429–31. Instead of requiring BNSF to meet this burden, the district court raised *sua sponte* four FRSA regulations with which to evaluate Cowden's claim, without thorough consideration of whether they "substantially subsume" that claim.

Second, questions of material fact remain that make summary judgment improper. The district court determined in its summary judgment order that FRSA regulations established the sole duty of care BNSF owed to Cowden. Cowden argues that, had he been put on notice and given the opportunity, he could have submitted evidence of FRSA violations. Furthermore, the district court improperly relied on disputed issues of fact about track conditions to support its alternative ruling denying Cowden's motion to amend, and the court did not view the record in a light favorable to the non-moving party.

A. BNSF has not demonstrated regulations "cover" Cowden's claim

Assuming that the analysis adopted by our sister circuits is correct, an FELA claim is precluded when the same claim would be preempted by the FRSA if brought as a state-law negligence claim. Nickels, 560 F.3d at 429–30. The FRSA preemption

clause, however, explains that state law is only preempted when the Secretary of Transportation adopts a rule or regulation "covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). To establish that regulations "cover" the plaintiff's claim, a defendant "must establish more than that they 'touch upon' or 'relate to' that subject matter, for 'covering' is a more restrictive term which indicates that preemption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." Easterwood, 507 U.S. at 664 (internal citation omitted).

BNSF made no mention of FRSA regulations in its summary judgment motion, and never argued that any particular regulation covered Cowden's claim. Addressing the matter *sua sponte*, the district court concluded that "[t]here are FRSA regulations permitting railroads to operate trains under slow orders, and the Court finds that these are safety regulations that exist, at least in part, to ensure the safety of the locomotive's passengers in the face of unsafe track conditions." Order of Sept. 7, 2010, at 8. The court offered as examples four specific FRSA regulations: 49 C.F.R. §§ 213.233 (setting forth instructions for procedure and frequency of track inspections), 234.107(c)(2) (dealing with warning signals at road crossings), 213.9(b) (allowing railroads to change maximum speed by reclassifying segments of track), and 213.237(e)(2) (setting requirements for inspection of internal flaws). Of these four regulations, two (§§ 234.107(c)(2) and 213.237(e)(2)) are unrelated to Cowden's claim, as his accident did not occur at a road crossing and he has made no allegations about internal flaws in the track. One of the regulations (§ 213.233) certainly "exist[s], at least in part, to ensure the safety" of passengers, but it contains no reference to the issue of train speed or slow orders, which the court found controlled the question of negligence. The fourth regulation, § 213.9(b), does relate to train speed, slow orders, and unsafe track conditions. However, a regulation must do more than "relate to" a plaintiff's claim in order for preclusion to apply.

-15-

Easterwood, Waymire, and Lane all concluded that § 213.9 substantially subsumed excessive-speed claims, but unlike the plaintiffs in those cases, Cowden has not alleged generally that BNSF allowed its trains to travel at an unsafe speed. See Easterwood, 507 U.S. at 675 n.15 (describing claim as alleging that the "train was traveling too quickly given the 'time and place'"); Waymire, 218 F.3d at 774 (describing claim as alleging that railroad allowed "train to travel at an unsafe speed"); Lane, 241 F.3d at 441 (describing claim as alleging "the train was proceeding at an excessive speed"). In fact, BNSF points out that Cowden's complaint nowhere mentioned "speed" specifically. See Appellee Br. at 3. Instead, Cowden's complaint alleges that BNSF failed to maintain a safe workplace, and his filings have consistently linked this unsafe workplace to BNSF's alleged failure to maintain a safe track. See, e.g., J.A. at 139 (memorandum opposing motion to exclude expert testimony); J.A. at 196 (memorandum opposing summary judgment); J.A. at 350 (motion to alter or amend the judgment).

Despite this distinction, § 213.9 may still substantially subsume Cowden's claim, but not in a way argued by BNSF or addressed by the district court. The FRA has explained that § 213.9 is not a regulation of train speed, but rather is a regulation that holds railroads accountable for maintaining certain track conditions based on the speed they set themselves. See Track Safety Standards, 63 Fed. Reg. at 33999. Cowden alleges that BNSF failed to maintain a safe track, and § 213.9 indicates what condition or "class" the track must meet in order for a train to operate at forty miles per hour. If relevant FRSA regulations establish a railroad's duty of care, § 213.9 imposes a duty to maintain track quality, not a duty to travel at a particular speed.[8]

_____

[8]In Easterwood, Waymire, and Lane, there were no questions about the quality of the track over which the respective trains were operating. Instead, the plaintiffs were alleging that lower speeds were required because of potential dangers at railroad crossings. Because § 213.9 establishes train speeds "with respect to track conditions, including the conditions posed by grade crossings," a negligence claim that seeks to impose a common-law standard for safe speeds at crossings is "'incompatible with'

-16-

Whether BNSF has breached that duty, however, appears to depend on other regulations from Chapter 213—many of which were addressed at various points by the parties, but not discussed by the district court. See, e.g., 49 C.F.R. § 213.63 (regulating track surface conditions for each class of track); 49 C.F.R. § 213.109 (regulating number of sufficient crossties for each class of track); 49 C.F.R. § 213.1 (indicating that regulations treat conditions in isolation, but that a combination of conditions may require additional remedial action).

## B. The record regarding FRSA compliance is underdeveloped

Having concluded that FRSA regulations set the exclusive standard of care for Cowden's claim, the district court held that there was no evidence in the record indicating that BNSF had violated any of those regulations. The district court acknowledged that Cowden's expert had asserted that BNSF violated numerous FRSA regulations. The court, however, concluded that Blackwell's report did not point to specific facts that would raise factual disputes sufficient to survive a motion for summary judgment.

Cowden argues that summary judgment was improper because he was not put on notice by BNSF's motion that his claim would be determined solely on the issue of FRSA regulations. Cowden cites Heisler v. Metropolitan Council, 339 F.3d 622 (8th Cir. 2003), where we stated:

> We have repeatedly held that in the Eighth Circuit, a district court commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties. It is fundamentally unfair to the nonmoving party to require her to address issues not addressed by the moving party in anticipation that the district court might rely on some unidentified issue to grant the motion.

FRSA and the Secretary's regulations." Easterwood, 507 U.S. at 675.

-17-

Id. at 631. We agree that such unfairness exists in this case, as the district court based its summary judgment on Cowden's failure to provide evidence relating to a previously-unidentified issue. We stated in Heisler that it would unfairly prejudice a plaintiff to grant a summary judgment motion based on a lack of evidence relating to an issue not raised by defendants in the summary judgment proceedings. In that case, summary judgment had been granted based on a previously-unaddressed retaliation claim:

> Met Council's argument that there is no evidence of retaliation demonstrates precisely why summary judgment must be reversed on the retaliation claim. Heisler did not get a chance to develop the record or point out material issues of fact contained in the record related to the elements of her retaliation claim because she was not on notice that the retaliation claim was at issue in the summary judgment proceedings. It may well be that Heisler will be unable to establish a genuine issue of fact regarding the retaliation claim, but she must at least be given a chance to try.

Id. at 632.

Summary judgment was inappropriate in the present case for the same reason. Neither party was on notice that the FRSA regulations would prove dispositive, and neither party presented evidence related to the relevant regulations. Indeed, as explained above, the district court's summary judgment order demonstrates that it wasn't even clear which regulations were relevant, let alone whether or not BNSF had complied with them.

On remand, BNSF has the burden of persuading the court that particular regulations meet the standard for preemption set out in § 20106(a)(2). Because Cowden's suit addresses the maintenance of track rather than simply alleging an excessive-speed claim, it appears likely that relevant regulations will deal more

-18-

specifically with track conditions. Even if Cowden is unable to establish a genuine issue of fact regarding BNSF's compliance with those regulations, he "must at least be given a chance to try." Id. Based on the current record, viewed in a light most favorable to Cowden, the quality of the track appears to be a disputed material fact. It may be that Cowden's claim relies on weak circumstantial evidence: the BNSF business records indicating persistent and unremedied problems with railroad-tie conditions. And it may be that Thornburg is correct in his belief that those records incorrectly state that there were tie-condition problems.[9] But this is a factual question that should be determined by a jury if further discovery does not conclusively resolve the dispute.

## IV. Reasonable Foreseeability

In denying Cowden's motion to alter or amend the judgment, the district court held in the alternative that Cowden's claim would have failed because Cowden did not establish a reasonable foreseeability of harm. Reasonable foreseeability of harm "is indeed 'an essential ingredient of [FELA] *negligence*.'" CSX Transp., Inc. v. McBride, 131 S. Ct. 2630, 2643 (2011) (alteration in original) (quoting Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 117 (1963)). "If a person has no reasonable ground to anticipate that a particular condition . . . would or might result in a mishap and injury, then the party is not required to do anything to correct [the] condition." Gallick, 372 U.S. at 118 n.7. In the present case, the district court concluded that BNSF had no reasonable ground to anticipate that the condition of the rails could lead to Cowden's injury, placing heavy emphasis on the fact that no prior accidents had occurred on the stretch of track in question, and that Cowden himself had never experienced a problem with that specific stretch of track.

---

[9]We also note that the missing geometry track data—which may, according to Thornburg, demonstrate there were no track surface problems in November 2007—does not appear to be relevant to the question of tie-conditions. See Thornburg Dep. 53:25–54:7, January 19, 2010.

The district court's reasoning on foreseeability reflects the same reasoning that the Supreme Court rejected in Gallick. In Gallick, the Court reversed a state-court decision denying an FELA negligence claim where a plaintiff's leg had to be amputated because of an infected bug bite. The bug bite was traced to a stagnant and infested pool by the railroad, which a jury found was created by the railroad company's negligence. The question for the Supreme Court was whether such an injury was foreseeable to the negligent employer. Gallick's jury had been instructed in state court to "take into account 'the past experience respecting the location and conditions in question' and the fact 'that no occurrence of the kind here alleged either occurred, or was known by defendant to have occurred'" in the past. Id. at 121. Based in part on those past conditions, the jury concluded that Gallick's injury was not foreseeable. The Court concluded, however, that such an instruction was "far too narrow a concept of foreseeable harm to negative negligence under the Federal Employers' Liability Act." Id. Instead, the Court reasoned that a defendant's duty of care under FELA should simply be "measured by what a reasonably prudent person would anticipate as resulting from a particular condition." Id. at 118; see also Ulfik v. Metro-North Commuter R.R., 77 F.3d 54, 58 n.1 (2d Cir. 1996) ("Though the issue of negligence is still governed by the common law requirement of foreseeability in order to determine whether or not a defendant is required to guard against a particular risk, the concept of foreseeability has been construed somewhat more liberally in FELA cases than it might otherwise be under common law."); Harbin v. Burlington N. R.R. Co., 921 F.2d 129, 131 (7th Cir. 1990) ("It is well established that the quantum of evidence required to establish liability in an FELA case is much less than in an ordinary negligence action.").

Cowden presented evidence that BNSF knew of problems with the stretch of track in question before the accident. Thus, the proper foreseeability question for the present case is whether a reasonably prudent person who knew of the reported problems would have anticipated an injury to occur as a result of operating a train over that stretch of track at the same speed. Relevant to this consideration is the

evidence that BNSF adopted more restrictive slow orders because of these problems, and then purportedly removed those restrictive slow orders without fixing the root problem.

The district court found that BNSF did not know of a problem with the track because it found dispositive Thornburg's testimony that "geometry track car data" suggested there actually were *no* surface condition problems with the segment in question.  This geometry track car data, however, was never entered into evidence. Cowden questioned why *any* slowdown order would have remained in place if there were actually no problems with the surface condition of the track, and Thornburg conceded that track foremen may have been concerned about the condition of the railroad ties. Despite this inconsistency, the court concluded that Thornburg's testimony rendered all evidence of earlier problems moot.  Even if this ultimately proves correct, the court's determination at the summary judgment stage does not reflect a review of the record in a light favorable to Cowden.

V. Motion to Exclude Expert Testimony

Cowden raises two arguments about the district court's order to bar the expert testimony of Alan Blackwell.  Although most of Blackwell's expert report was admitted, Cowden argues that the court erred by excluding Blackwell's testimony about the possible negligence of permitting the train to operate at a speed permitted by FRSA regulations and by barring his testimony about subsequent remedial measures under Federal Rule of Evidence 407.  We review a decision to exclude expert testimony for an abuse of discretion.  Shelton v. Kennedy Funding, Inc., 622 F.3d 943, 950 (8th Cir. 2010).

As stated above, if we assume that FRSA preclusion is appropriate in some cases, BNSF bears the burden to show that specific regulations substantially subsume Cowden's claim under § 20106(a)(2).  If BNSF meets that burden, the district court

-21-

may assess the admissibility of Blackwell's testimony on the subsumed subject matter. However, because BNSF did not meet its burden below, we reverse that part of the district court's ruling and remand it for further consideration.

The district court's decision to bar Blackwell's testimony about remedial measures is not, however, related to the issue of preclusion. The district court concluded that this portion of Blackwell's testimony would be offered to prove negligence, which is prohibited by Rule 407. On appeal, Cowden argues that this evidence meets an exception to Rule 407 because remediation was "mandated by law."[10] Although we have noted in the past that there is an exception to Rule 407 when remedial action is "mandated by superior governmental authority," O'Dell v. Hercules, Inc., 904 F.2d 1194, 1204 (8th Cir. 1990), Cowden has failed to demonstrate that remediation was actually mandated. Cowden asserts that 49 C.F.R. § 213.5(a) imposes a requirement that railroads remedy any defect, but the plain language of the regulation does not support his assertion. Section 213.5 imposes responsibility for compliance with FRA regulations; however, if a railroad knows its track is not in compliance, repairing track to bring it into compliance is but one of

---

[10]This argument is different than Cowden's assertion before the district court that the evidence met an exception to Rule 407 because it could be used to demonstrate the feasibility of repairs. Because feasibility of repairs was not in dispute, the district court rejected Cowden's argument.

three options a railroad has to avoid penalties.[11]  The district court did not abuse its discretion in excluding this portion of Blackwell's testimony.

## VI. Conclusion

Accordingly, we reverse in part and affirm in part the decision of the district court, and we remand for further proceedings consistent with this opinion.

_____

[11]Section 213.5(a) provides:

[A]ny owner of track to which this part applies who knows or has notice that the track does not comply with the requirements of this part, shall--

    (1) Bring the track into compliance;

    (2) Halt operations over that track; or

    (3) Operate under authority of a person designated under § 213.7(a), who has at least one year of supervisory experience in railroad track maintenance, subject to conditions set forth in this part.