In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1686

BRIAN CROMPTON,

*Plaintiff-Appellee,*

*v.*

BNSF RAILWAY COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:11-cv-00431-JPG-DGW — **J. Phil Gilbert**, *Judge.*

ARGUED SEPTEMBER 27, 2013 — DECIDED MARCH 12, 2013

Before WOOD, *Chief Judge*, and BAUER and EASTERBROOK,
*Circuit Judges.*

BAUER, *Circuit Judge.* Brian Crompton ("Crompton")
brought suit against BNSF Railway Company ("BNSF") under
the Federal Employment Liability Act, 45 U.S.C. §§ 51-60 and
the Locomotive Inspection Act, 49 U.S.C. § 20701. He alleges
that he was knocked off a train due to negligence on the part
of BNSF. BNSF moved for summary judgment on both counts;
the district court denied its motion and allowed the case to

proceed to a jury. The jury found BNSF liable and awarded damages to Crompton. BNSF now appeals to this Court. The issue before us is whether the evidence presented at trial was sufficient for a jury to conclude that BNSF was negligent. We find that it was and affirm.

## I. BACKGROUND

Crompton began work as a railroad conductor for BNSF in 2001. On April 24, 2011, he worked on BNSF 5695, a General Electric AC4400 series locomotive, which was set to travel from Paducah, Kentucky, to Centralia, Illinois. Before the train departed, Bruce Yancey ("Yancey"), a BNSF engineer, performed the required daily inspection. Yancey found no defects with the locomotive, including its doors and latches. During the trip, Crompton exited the front cab door several times, and found nothing wrong with the door or its latch. As the train approached Neilson Junction, it was traveling downhill. Crompton exited the front cab door of the locomotive to throw a switch so that the train would continue towards Centralia. He asserts that he closed and latched the front cab door before he stepped out onto the platform. The door remained closed for fifty-one seconds, and then it suddenly flew open, knocking Crompton off the train and to the ground. He suffered injuries to his head, neck, and back.

Crompton brought suit against BNSF under both the Locomotive Inspection Act ("LIA") and the Federal Employment Liability Act ("FELA"), claiming that BNSF failed to keep the locomotive and its parts in good working order, and that he was injured due to BNSF's negligence.

### A. BNSF's Motion for Summary Judgment

BNSF moved for summary judgment on both counts. In response, Crompton attached the depositions of BNSF engineer Yancey, BNSF engineer Lindell David Perry, Jr. ("Perry"), and BNSF machinist Francis Ferry ("Ferry"). Yancey testified that he had ridden on similar model AC 4400 locomotives when the front cab door came open on its own without being opened or operated by a crew member. He also stated that doors coming open were common problems found on AC 4400 locomotives, and that BNSF's management was aware that the front cab doors come open improperly. He stated that he once attended a safety meeting that was called and conducted by BNSF company management due to another employee's injury that was caused by a locomotive's front door coming unlatched and opening. Perry stated that he had been on locomotives similar to BNSF 5695 where the front cab door came open on its own without being opened by a crew member as well, and said that BNSF was well aware of this problem. Ferry inspected BNSF 5695 after the accident, and commented that if the front cab door had been latched by Crompton, it would not have come open absent some sort of defect.

The district court denied BNSF's motion for summary judgment, explaining that a reasonable jury could conclude that the latch was defective. The court found that the evidence, taken in the light most favorable to Crompton, was sufficient for the case to proceed to a jury.

### B. The Trial

At trial, Crompton presented the testimony of BNSF engineers Yancey and Perry. Both men testified that they had been on locomotives similar to BNSF 5695 where the front cab door had come open on its own without being unlatched by a crew member. They also asserted that BNSF was aware of this issue. Crompton testified as well, saying he was certain that he had closed and latched the door before he exited the locomotive as the train approached Neilson Junction. He also pointed out that the door remained closed for 51 seconds after he latched it even though the train was traveling downhill. He presented evidence of other types of latches that BNSF could have employed on the front cab door, which he claims would have better secured the door.

BNSF then presented evidence that Yancey conducted a pre-trip inspection of BNSF 5695 on the morning of the accident, but found no defects with the door or its latch; he certified that everything was working properly. Yancey inspected the locomotive again after the accident, and found no defects with the door or its latch. BNSF also presented the expert testimony of machinist Clifford Bigelow ("Bigelow"). Bigelow inspected BNSF 5695 after the accident, and confirmed the absence of a defect in the latch. He stated that he "saw no plausible explanation for that door unlatching by itself without some outside manipulation." Bigelow explained that the handle would have had to move nearly 45 degrees to disengage the door from the door frame, and testified that vibration alone would not be something that could have manipulated the handle open.

BNSF also relied on Crompton's testimony. Crompton had used the latch on the front cab door of BNSF 5695 several times during the trip from Paducah to Centralia on April 24, 2011, and testified that he found nothing wrong with the door or its latch. He also acknowledged that he did not notice any excess vibration or any rough spots as the train approached Neilson Junction, and admitted that he did not know why the latch came open.

In addition, BNSF presented evidence that the latch on the front cab door of BNSF 5695 had a perfect safety inspection record. Dana Maryott ("Maryott"), the director of BNSF's maintenance and inspection policies, testified that every locomotive is required to undergo a calendar day safety inspection, which must be recorded in BNSF's database. He explained that if defects are noted during the inspection, those issues are reported to the mechanical desk, which enters the information into the database. Maryott reviewed the maintenance records of BNSF 5695, and found no reports of any defects with its doors or latches. Maryott also presented the daily inspection reports for all BNSF locomotives in the 4400 series, those with doors and latches similar to those on BNSF 5695, and found no reports of any defective doors or latches between January 2002 and March 2012.

After weighing the evidence, the jury found BNSF negligent and Crompton contributorily negligent. The jury allotted 70% of the fault to BNSF and 30% to Crompton. The jury determined that BNSF violated both the FELA and the LIA, a strict liability statute, so BNSF was required to pay 100% of Crompton's damages. The jury awarded $1.6 million to Crompton.

BNSF moved for judgment as a matter of law and then moved for a new trial. BNSF argued that since Crompton had produced no evidence of a defect with the door or its latch, the evidence presented was legally insufficient to support a finding of liability. The district court, however, denied BNSF's motions, finding that there was "sufficient evidence from which a jury could conclude that the latch was defective and that BNSF had notice of the defect." The district court explained, "Crompton's testimony that he latched the door coupled with the jury's conclusion that the latch was intended to keep the door closed could reasonably lead the jury to conclude that the door was defective when the door opened after Crompton had latched it." BNSF now appeals.

## II.  DISCUSSION

This Court reviews sufficiency of the evidence challenges *de novo*, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in its favor. *Wis. Alumni Research Found. v. Xenon Pharm. Inc.*, 591 F.3d 876, 885–86 (7th Cir. 2010). We defer to the credibility determinations of the jury, *United States v. Perez*, 612 F.3d 879, 885 (7th Cir. 2010), and will overturn a jury verdict "only when there is a complete absence of probative facts to support the conclusion reached." *Lavender v. Kurn*, 327 U.S. 645, 653 (1946); *Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 911 (7th Cir. 2012).

### A.  The FELA

Crompton brought suit against BNSF under the FELA. The FELA imposes on railways a general duty to provide a safe workplace. *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 300 (7th Cir. 1996). It states:

> every common carrier by railroad … shall be liable
> in damages to any person suffering injury while he
> is employed by such carrier … for such injury or
> death resulting in whole or in part from the negli-
> gence of any of the officers, agents, or employees of
> such carrier, or by reason of any defect or insuffi-
> ciency, due to its negligence, in its cars, engines,
> appliances, machinery, track … or other equipment.

49 U.S.C. § 51.

The FELA provides a "broad federal tort remedy for railroad workers injured on the job," *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1061 (7th Cir. 1998), and should be construed liberally to effectuate congressional intent. *Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 562 (1987). While a plaintiff must prove "the common law elements of negligence [to prevail in a FELA case], including foreseeability, duty, breach, and causation," *Fulk v. Illinois Cent. R.R. Co.,* 22 F.3d 120, 124 (7th Cir. 1994), a "relaxed standard of causation applies under FELA." *CSX Transp., Inc. v. McBride*, 131 S.Ct. 2630, 2636 (2011). The FELA "vests the jury with broad discretion to engage in common sense inferences regarding issues of causation and fault." *Harbin v. Burlington N. R.R. Co.,* 921 F.2d 129, 132 (7th Cir. 1990). "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35 (1944).

### B.  The LIA

Crompton brought suit against BNSF under the LIA as well. The LIA provides that a locomotive and its parts must be "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). The LIA does not create a right to sue, but merely establishes a safety standard; a failure to comply with that standard is negligence per se under the FELA. *Urie v. Thompson*, 337 U.S. 163, 188–89 (1949).

### C.  Sufficiency of the Evidence

The parties present competing theories of causation in this case: Crompton argues that the latch on the front cab door was defective in some way, which caused the door to come open, while BNSF contends that Crompton never properly latched the door, which is the reason it came open. When faced with alternative theories of causation, it is not our job to decide which theory is more plausible; instead, as long as facts exist to support the jury's conclusion, its verdict must stand. BNSF may not "relitigate the factual dispute" in this court. *Lavender v. Kurn*, 327 U.S. at 652.

The Supreme Court's opinion in *Lavender v. Kurn* proves instructive. Haney, a railroad employee, was operating a switch one evening so that a train could reenter the station. *Id.* at 647. After the train passed the switch, Haney was found on the ground nearby, unconscious. *Id.* at 648. He had been struck in the back of the head by "some fast moving small round object." *Id.* A doctor testified that the object may have been attached to a slow-moving train, but also admitted that Haney's skull fracture may have been caused by a blow from

a pipe or a similar object. *Id.* at 649. The parties presented conflicting theories of causation: the plaintiff asserted that Haney was struck in the back of the head by a hook that protruded from the side of the rail car, whereas the railroad theorized that Haney was murdered for his money by one of the "tramps and hoboes" who frequented the area. *Id.* If the first theory was accurate, then the railroad was liable for Haney's death. The hook was affixed to the train at a height about a foot taller than Haney. *Id.* However, if Haney had been standing on a mound of dirt located near the track at just the right moment, he may have been sufficiently tall enough for the hook to have struck him in the head. *Id.* Other evidence, supporting the railroad's theory, showed that Haney's pistol was found loose under his body, and that his empty wallet was recovered about a block away. *Id.* at 650. The jury found the railroad liable, but the Missouri supreme court reversed. *Id.* at 651. The Supreme Court then reinstated the jury's verdict. *Id.* at 652. The Court explained that even though the evidence tended to indicate that it was "physically and mathematically impossible for the hook to strike Haney," this evidence was irrelevant upon appeal, since there was a "reasonable basis in the record for inferring that the hook struck Haney." *Id.* The Court stated that "it would be an undue invasion of the jury's historic function to weigh the conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury." *Id*. at 652–53.

In *Ellis v. Union Pac. R. Co*, 329 U.S. 649 (1947), the Supreme Court reasoned along similar lines. A railroad employee was crushed between a train car and a building. *Id.* at 650. A jury reached a verdict in favor of the employee, but the state

Supreme Court reversed, finding the evidence insufficient to support a finding of negligence. *Id.* The Supreme Court reinstated the jury's verdict, stating:

The choice of conflicting versions of the way the accident happened, the decision as to which witness was telling the truth, the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury. Once there is a reasonable basis in the record for concluding that there was negligence which caused the injury, it is irrelevant that fair-minded men might reach a different conclusion. For then it would be an invasion of the jury's function for an appellate court to draw contrary inferences or to conclude that a different conclusion would be more reasonable. And where, as here, the case turns on controverted facts and the credibility of witnesses, the case is peculiarly one for the jury. *Id.* at 653.

In *Lynch*, we explained that a jury can "make reasonable inferences based on [] circumstantial evidence even where conflicting inferences are also appropriate and where no direct evidence establishes which inference is correct." 700 F.3d at 917. We reasoned that as long as it was "'possible to tell a story' that involve[d] employer negligence," summary judgment was improper. *Id.* at 918 (quoting *Coffey v. Ne. Illinois Reg'l Commuter R.R. Corp. (METRA)*, 479 F.3d 472, 476 (7th Cir. 2007).

Here, the case turns on whether it was possible to tell a story, based on the evidence presented, that the latch on the front cab door of BNSF 5695 was defective in some way, which caused it to come open. The latch at issue was a counter-weighted door latch, which works using gravity. The door's

handle acts as a counterweight; when properly latched, it holds the door closed. The latch could fail only if (1) the door frame was warped, (2) friction prevented the handle from turning enough to allow it to properly latch, (3) jostling or vibration added enough energy to overcome the force of gravity and to turn the latch upward, allowing the door to come open, or (4) the door was never properly latched in the first place.

Crompton does not argue that the door frame was warped or that friction prevented the handle from turning. Instead, he asserts that the front cab door must have been defective in some way, since he is certain that he latched the door, and the door stayed closed for almost a minute before suddenly flying open. He theorizes that the slowing of the train as it traveled downhill, coupled with the train's vibration, must have jostled the door handle enough to cause the door to come unlatched. To support this theory, Crompton presented evidence from several BNSF employees, who testified that they had seen similar train doors come open on their own in the past, without being unlatched by a crew member. The jury chose to believe Crompton's theory of causation and ruled in his favor.

As a matter of physics, Crompton's theory is implausible, since the door's counterweighted handle would have had to move upwards against gravity in order to unlatch the door. BNSF's expert explained that the door handle would have had to engage in a "very significant amount of rotation to disengage it from the door frame" and posited that he didn't "see [vibration] having nearly [the] amplitude required to rotate the handle out of position, to the open position." The front cab door potentially could have come unlatched if the train hit a hole or encountered excessive vibration, but the record does

not support such a finding. Yancey, the train's engineer, testified that he noticed no rough spots or jolts as the train approached Neilson Junction. Crompton agreed, and could point to no rough spots or jolts to explain the sudden opening of the door.

Though we may find Crompton's theory improbable as far as the laws of physics are concerned, BNSF has produced no evidence to prove his theory impossible. The record contains ample evidence to support Crompton's version of events as well as the jury's inference that the front cab door of BNSF 5695 must have been defective in some way. Several BNSF employees testified that doors with a latch just like the one on the front cab door of BNSF 5695 came open from time to time without any outside manipulation. They also testified that BNSF was aware of these doors coming open, and held at least one meeting to discuss the issue. Crompton testified that on April 24, 2011, as the train approached Neilson Junction, he was sure that he latched the door; afterwards, the door stayed closed for almost a minute before it flew open and knocked him from the train. When "there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion." *Lavender v. Kurn*, 327 U.S. at 653. Here, the jury chose to believe Crompton's version of events, and there was a reasonable basis in the record for it to do so. Since BNSF presented no evidence on appeal sufficient to disprove Crompton's theory of causation, we will not disturb the jury's verdict.

### III.  CONCLUSION

The evidence presented at trial was sufficient for a jury to conclude that BNSF was negligent. Accordingly, we AFFIRM the jury's verdict.