Ronald D. MADDEN, Plaintiff,

v.

ANTON ANTONOV & AV TRANSPORTATION, INC., and BNSF Railway Company, Defendants.

4:12–CV–3090

United States District Court, D. Nebraska.

Signed February 17, 2015

Donald F. D'Antuono, Schnell, D'Antuono Law Firm, Denver, CO, Jeffrey E. Chod, Patrick S. O'Brien, O'Brien, Chod Law Firm, St. Louis, MO, for Plaintiff.

David C. Mullin, Fraser, Stryker Law Firm, Omaha, NE, Katherine Q. Martz, Nichole S. Bogen, Sierra M. Falter, Thomas C. Sattler, Sattler, Bogen Law Firm, Lincoln, NE, for Defendants.

## MEMORANDUM AND ORDER

John M. Gerrard, United States District Judge

This case arises from a collision between a train owned by defendant BNSF Railway Company and a truck driven by defendant Anton Antonov for AV Transportation. Plaintiff Ronald D. Madden, the train's conductor, sustained serious injuries in the collision. Madden's operative complaint asserts a state-law negligence claim against Antonov and AV transportation and a claim under the Federal Employers' Liability Act (FELA), 45 U.S.C.

§ 51 *et seq.*, against BNSF. This matter is before the Court on BNSF's motion for summary judgment.[1] Filing 196. For the reasons discussed below, BNSF's motion will be denied.

### I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial.

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id*, Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir.2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791–92 (8th Cir.2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

### II. FACTUAL BACKGROUND [2]

The collision in this case occurred at the intersection of County Road 429 ("CR 429") and a double main line track near Anselmo, Nebraska. On the evening of February 15, 2012, Madden was working as a BNSF conductor taking an empty coal train from Ravenna, Nebraska to Alliance, Nebraska. In the cab with him was engineer Brad Tyree. Approaching the crossing, the tracks run generally southeast to northwest. Madden's train was travelling northwest on Main Track 1, approaching the CR 429 crossing. Filing 227 at ¶¶ 1–4.

The layout of this crossing features significantly in the parties' dispute, and so the Court has included a diagram below.[3] At the crossing, the two main line tracks run parallel to State Highway 2, which lies south of the tracks. CR 429 runs north and south and intersects both the rail tracks and Highway 2. CR 429 is not perpendicular with the tracks. Instead, it

---

1. Also before the Court are Madden's objection to the Magistrate Judge's order on his motion to compel (filing 226), several *Daubert* motions filed by BNSF (filings 199, 202, 205, and 208), and a motion to bifurcate filed by BNSF (filing 247). These motions will be resolved by separate orders, which will be issued shortly following this Memorandum and Order.

2. Many of the basic facts in this case are uncontroverted, and the Court has, to that extent, relied on the parties' statements of undisputed facts. *See* NECivR 56.1.

3. The diagram was submitted by BNSF (filing 198-3 at 22), but Madden does not dispute that it provides a generally accurate depiction of the crossing.

intersects them at either a 35 or 50 degree angle (the precise angle is disputed).[4] Filing 198–3 at 4–5; filing 198–5 at 156. The intersection was equipped with a crossbuck with a "2 tracks" sign, but no active warning devices such as gates or flashing lights. Filing 227 at If 31; filing 198–5 at 157–58.

In February, 2012, The Andersons ("Andersons"), an agricultural commodities business, was constructing a grain elevator and rail load out facility on property north of the tracks. The construction plans called for an industry track loop that would connect to BNSF's main line and provide service to Andersons' grain elevator. Filing 227 at ¶ 5.

On the evening of February 15, 2012, Antonov was driving northwest on Highway 2 to deliver a large piece of construction equipment to Andersons' construction site. As Antonov approached CR 429, a different BNSF train was moving northwest, very slowly, on the southern track (nearest to Highway 2). Antonov pulled over onto the shoulder of Highway 2 rather than turning onto CR 429, because there was little room between the turn and the tracks, and he was concerned that if he turned, his trailer would be blocking part of Highway 2 while he waited for the train to pass. After waiting about 5 minutes,

---

**4.** More accurately, this is the angle that a driver would perceive if, as was the case with Antonov, the driver was approaching from the south and a train was approaching from his right (i.e., headed from southeast to northwest, as Madden's train was). Of course, based upon Madden's precise positioning, the angle he perceived may have been different. Filing 198–5 at 112–15. BNSF's expert, Joseph D. Blaschke, measured the angle as about 50 degrees, while Madden's expert measured the angle as 35 degrees. *Compare* filing 198–3 at 4–5, *with* filing 198–5 at 156. Regardless of the precise angle, it increased the difficulty for drivers coming from the south to see trains coming from the east.

the slow train passed, and as soon as it had passed, Antonov began turning and proceeded across the tracks. Filing 227 at ¶¶ 6–12. When Antonov approached the crossing, Madden's train was approaching from the southeast and proceeding in a northwesterly direction on the northern track. Antonov was not able to see Madden's train because of the angle of the crossing and because his truck's cab lacked a rear window, and Antonov testified that he did not hear the train's horn over the noise of his truck and the construction occurring across the tracks at Andersons' site. Filing 228–4 at 4–7. Antonov testified that he did not realize Madden's train had been approaching until after the collision. Filing 228–4 at 3.

As Antonov began to cross the tracks, Madden's train was approaching the crossing, on the far north track, moving at about 54 miles per hour. Filing 227 at ¶¶ 13, 16. This was within the applicable speed limit, which was either 55 or 60 miles per hour. Filing 227 at ¶¶ 13, 16; filing 198–2 at 13; filing 198–5 at 34. Tyree, the engineer, had a clear view of the crossing and Antonov's truck from his position in the train's cab. Filing 227 at ¶ 14. At first, Tyree thought that although Antonov was cutting it close, his truck and trailer would clear the crossing in time, if Antonov would pick up his pace. Filing 198–5 at 28–29. In accordance with railroad regulations, Tyree had already begun blowing the train's horn as he approached the crossing. An event recorder from the train shows that the horn was blowing approximately 18 to 19 seconds before the impact. The train's headlights and ditch lights were also functioning and shining. Filing 198–2 at 15; filing 198–5 at 28.

But a few seconds after he first spotted Antonov's truck, Tyree testified, it appeared that Antonov had stopped in the middle of the track, and at that point, Tyree realized Antonov would not clear the track in time. Filing 198–5 at 28–29. Antonov disputes that he stopped, but claims he continued traveling at approximately 5 miles per hour. Filing 198–5 at 58–59. It was about 10 seconds before impact when Tyree realized that Antonov's truck would not clear the crossing, and at that point Tyree applied the train's emergency brake. Filing 227 at ¶ 20. Madden testified that he had been working on his signal sheet and had not noticed the truck, and so at first he did not understand what was happening. He first noticed the impending collision when he heard Tyree tell the dispatcher that their train was about to hit a truck. Madden and Tyree have provided somewhat different accounts of what occurred next.

Tyree testified that Madden appeared "frozen" and did not move until Tyree told him to get down on the floor and then grabbed his shirt and pulled him to the floor. Filing 198–5 at 30–31. Madden testified that Tyree "touched" his arm, and that Madden then moved his seat back and "turned around and squatted down and was going to put [his] back on the wall where the frig is, and right as [he] almost got to [his] butt," the collision occurred. Filing 228–3 at 7. By then, Madden testified, Tyree was in the "hole" in the nose of the train's cab—at the foot of the stairs in the cab's nose—and was crouched over and braced, with his feet at the bottom of the two stairs and his hands on the floor of the cab. Madden testified that there was not room for both of them in the hole, unless Madden had pushed Tyree out of the way and they had been standing vertically, rather than braced. Filing 228–3 at 6–7.

Tyree, however, testified that he would not have gone down into the nose of a locomotive, because it could be crushed in a front-end collision. Instead, Tyree stated that he pulled Madden down to the

floor of the cab and positioned himself "kind of on top of" Madden, "with [his] elbow across [Madden's] back area." Filing 198–5 at 32–33; filing 228–4 at 9, 12.

Antonov's truck made it across the tracks, but his trailer did not, and the train collided with it. Filing 227 at ¶ 27. Madden remembers hitting his head on a wall, then waking up in the foot well under his seat. Filing 228–3 at 7. Madden suffered numerous injuries as a result of the collision, including, among other things, mild traumatic brain injury, loss of vision in his left eye, and damage to his spine and extremities. Filing 198–5 at 178–183. Tyree, by comparison, suffered no significant injuries. Filing 197 at 1.

### III. ANALYSIS

■■■■■ Madden's sole claim against BNSF is for negligence under FELA.[5] Enacted in 1908, FELA provides railroad employees with a federal cause of action for injuries "resulting in whole or in part from the negligence" of the railroad. 45 U.S.C. § 51. The statute imposes upon employers a continuous duty to provide a reasonably safe place to work. *Cowden v. BNSF Ry. Co.,* 690 F.3d 884, 889 (8th Cir.2012). FELA is to be liberally construed, but it is not a workers' compensation statute, and the basis of liability is "negligence, not the fact that injuries occur." *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 543, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). So, Madden must prove the customary common law elements of a negligence claim: duty, breach, foreseeability, and causation. *Crompton .v. BNSF Ry. Co.,* 745 F.3d 292, 296 (7th Cir.2014); *Tufariello v. Long Island R. Co.,* 458 F.3d 80, 87 (2d Cir.2006). However, the Court applies a relaxed standard of causation under FELA. *CSX Transp., Inc. v. McBride,* 564 U.S. 685, 131 S.Ct. 2630,

2636, 180 L.Ed.2d 637 (2011). "Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Id.*

Madden claims that BNSF was negligent under FELA in a variety of ways. Filing 18 at ¶ 33. But essentially Madden alleges that BNSF failed to provide him with a reasonably safe place to work. In his briefing, Madden has identified more specific theories of negligence, which for purposes of the pending motion can be placed into three analytical categories.

The Court will term the first category "crossing safety." Madden asserts that the CR 429 crossing was exceptionally hazardous, that BNSF knew or should have known this, and that BNSF should have taken steps to decrease the likelihood or severity of. a grade crossing collision, such as installing flashing lights or automatic gates, providing flagmen, or implementing a slow order for his train. The second category can be labeled "collision education," and includes both an alleged failure to train and failure to warn. Madden contends that BNSF was negligent in failing to train him how to respond to an imminent crossing collision. If BNSF had done so, Madden asserts, he could have reacted more quickly and positioned himself in a secure, braced position. Similarly, Madden claims that BNSF should have issued a warning to his crew that the CR 429 crossing was hazardous, and that if they had, he would have been watching out for trucks such as Antonov's and could have reacted more quickly and effectively. In the third and final category—"coordination"—Madden argues that BNSF failed to

---

**5.** In his operative complaint, Madden also asserted a claim under 29 U.S.C. § 654(a)(1), the Occupational Safety & Health Administra-

tion "general duty" clause, filing 18 at ¶ 33(*l*), but he has since withdrawn this claim. Filing 227 at 74–75.

"adequately coordinate" with Andersons or "other authorities" to ensure that the crossing was safe for trucks on their way to Andersons' worksite.

BNSF has moved for summary judgment, raising distinct arguments as to each of Madden's theories of negligence. But BNSF's arguments can generally be placed into three categories corresponding to those above. First, BNSF contends that Madden's crossing safety theory is precluded by the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20101 *et seq.* Second, as to Madden's crossing education theory, BNSF argues that it had no duty to educate Madden on how to respond to an imminent collision, and that even if it did, Madden has failed to produce evidence that such training, or an advance warning regarding the crossing, would have reduced his injuries. And third, as to Madden's coordination theory, BNSF argues that it had no duty to control traffic on public roadways or provide flagmen for private parties using public railroad crossings, and so, it could not have been negligent in failing to coordinate with Andersons.

The Court finds BNSF's arguments unpersuasive, and further finds that there exist genuine issues of material fact which preclude summary judgment. Some, but not all, of BNSF's arguments warrant further discussion. First, Madden's FELA claims are not precluded by FRSA. As a result, Madden's crossing safety theory may proceed to trial. Second, there is no "training" exception to the general duty railroads bear under FELA to provide employees with a reasonably safe place to work. Whether BNSF breached that duty, under the particular circumstances of this case, presents a question of fact that must be resolved by a jury. So, Madden's collision education theory will also proceed to trial. Third and finally, the Court finds that BNSF's arguments regarding the lack of a duty to control traffic on a public road are misplaced, and that issues of fact preclude summary judgment on Madden's coordination theory.

## A. FRSA Preclusion

FRSA was enacted in 1970, with the stated purpose of "promot[ing] safety in every area of railroad operations and reduc[ing] railroad-related accidents and incidents." 49 U.S.C. § 20101. While FELA is a general negligence statute that neither requires nor prohibits specific conduct by a railroad, FRSA proscribes railroad conduct by empowering the Secretary of Transportation to implement comprehensive and detailed railroad safety regulations. *Waymire v. Norfolk and Western Ry. Co.,* 218 F.3d 773, 775 (7th Cir.2000); *see* 49 U.S.C. § 20103. BNSF contends that Madden's crossing safety theory— that BNSF should have placed additional warning devices or issued a slow order—is precluded, because BNSF was in compliance with FRSA regulations covering both matters.

FRSA contains an express pre-emption provision, but it addresses only State laws, regulations, and lawsuits; it does not mention FELA or any federal safety standards. Under FRSA's express pre-emption provision, "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). States may adopt or continue in force laws or regulations related to railroad safety "until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). In *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), the Supreme Court held that a state-law negligence claim is "covered" and thus pre-empted if a FRSA regulation

"substantially subsume[s]" the subject matter of the suit.

BNSF asserts that just as FRSA pre-empts state-law negligence suits, it should preclude negligence suits under FELA. BNSF has correctly framed the issue as one of *preclusion* rather than pre-emption. "In pre-emption cases, the question is whether state law is pre-empted by a federal statute, or in some instances, a federal agency action." *POM Wonderful LLC v. Coca–Cola Co.*, —— U.S. ——, 134 S.Ct. 2228, 2236, 189 L.Ed.2d 141 (2014). This case, however, concerns the possible "preclusion of a cause of action under one federal statute by the provisions of another federal statute." *Id.* Thus, *Easterwood* is not controlling. *See Cowden*, 690 F.3d at 890. While preclusion analysis is not governed by the "complex categorization" applicable to pre-emption, the principles of pre-emption are "instructive insofar as they are designed to assess the interaction of laws that bear on the same subject." *POM Wonderful*, 134 S.Ct. at 2236. However, the matter is ultimately a question of statutory interpretation. *Id.*

Courts have reached differing conclusions regarding the preclusive effect of FRSA. The Seventh Circuit has held that FELA claims are precluded by FRSA. *Waymire*, 218 F.3d at 776. Using *Easterbrook* as a guide, the *Waymire* court held that FELA claims are precluded if similar state-law claims would be pre-empted. *Id.* The Sixth and Fifth Circuits have embraced the reasoning of *Waymire*. *Nickels v. Grand Trunk W.R.R., Inc.*, 560 F.3d 426, 430 (6th Cir.2009); *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443 (5th Cir.2001). But this view is not without its detractors. *See, e.g., Powell v. Union Pac. R. Co.*, 2013 WL 1857893 (E.D.Cal. May 2, 2013); *Earwood v. Norfolk S. Ry. Co.*, 845 F.Supp. 880, 891 (N.D.Ga.1993); *Myers v. Ill. Cent. R.R. Co.*, 323 Ill.App.3d 780, 257

Ill.Dec. 365, 753 N.E.2d 560, 565 (2001). Recently, in *Cowden*, the Eighth Circuit criticized the reasoning of *Waymire* and its progeny, but declined to create a circuit split, noting that the issue was not squarely presented by the posture of the case. *Cowden*, 690 F.3d at 891–92. Madden concedes that FRSA regulations cover the substance of his crossing safety theory, and that under *Waymire*, this theory would be precluded. Filing 227 at 70–71. So, Madden asks the Court to reject the reasoning of *Waymire*, while BNSF asks the Court to follow it.

*Waymire*, like *Easterwood*, involved a collision between a train and a vehicle. While the plaintiff in *Easterwood* was the widow of the vehicle's driver, bringing state-law claims, the plaintiff in *Waymire* was the train's conductor, and brought suit under FELA. *Easterwood*, 507 U.S. at 661, 113 S.Ct. 1732; *Waymire*, 218 F.3d at 774. Like Madden, Waymire alleged that the railroad was negligent in allowing his train to travel too fast and in failing to install proper warning devices, although both the train's speed and the existing devices complied with FRSA regulations. *Waymire*, 218 F.3d at 774, 776–77. In finding the FELA claims precluded, the *Waymire* court reasoned that it would "seem absurd to reach a contrary conclusion [to *Easterwood*] in this case when the operation of both trains was identical and when the Supreme Court has already found that the conduct is not culpable negligence." *Id.* at 776. The *Waymire* court explained that "allowing] a plaintiff to argue adequacy of warning claims under FELA but not under state law would undermine the railroad safety uniformity intended by Congress." *Id.* at 777. The *Lane* court elaborated upon this reasoning, holding that

[d]issimilar treatment of the claims would have the untenable result of making the railroad safety regulations estab-

lished under the FRSA virtually meaningless: "The railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA with respect to other classes of plaintiffs for the very same conduct."

*Lane,* 241 F.3d at 443 (quoting *Waymire v. Norfolk & W. Ry. Co.,* 65 F.Supp.2d 951, 955 (S.D.Ind.1999)).

This Court is not persuaded by the reasoning of *Waymire* or its progeny, and respectfully declines to follow suit. Neither the plain text of FRSA nor its goal of national uniformity demand preclusion of FELA claims. Rather, the text of FRSA and the purposes underlying both it and FELA demand the opposite.

The *Waymire* line of precedent elevates uniformity at the expense of safety, but that is not the balance Congress has struck. By its plain terms, FRSA's pre-emption provision applies only to certain state-law requirements, not FELA or any other federal law. 49 U.S.C. § 20106(a)(2). In effect, then, BNSF asks the Court to ignore the word "State" in the statute. *See POM Wonderful,* 134 S.Ct. at 2239. "Even if it were proper to stray from the text in this way, it is far from clear that [BNSF's] assertions about national uniformity in fact reflect the congressional design." *See id.* As the *Cowden* court explained, "FRSA—and in particular, its speed regulations—were adopted to address the patchwork effect of each state applying its own set of regulations. To this extent, it is not clear how negligence claims brought under federal common law threaten the uniformity sought by the FRSA." *Cowden,* 690 F.3d at 891 (citation omitted).

In *POM Wonderful,* the Supreme Court rejected a similar argument that the uniformity sought to be achieved through labelling regulations under the Federal Food, Drug, and Cosmetic Act precluded suits alleging unfair competition based on misleading labels under the Lanham Act:

> Although the application of a federal statute such as the Lanham Act by judges and juries in courts throughout the country may give rise to some variation in outcome, this is the means Congress chose to enforce a national policy to ensure fair competition. It is quite different from the disuniformity that would arise from the multitude of state laws, state regulations, state administrative agency rulings, and state-court decisions that are partially forbidden by the FDCA's pre-emption provision. Congress not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important.

134 S.Ct. at 2239–40.

The same is true of lawsuits under FELA. Such cases will necessarily introduce some degree of heterogeneity into the law of railroad safety. But this is quite different from the disarray that would result from 50 states imposing their own varying regulations and standards of negligence. This is especially true for FELA, which the Supreme Court has long emphasized must be given a "uniform application throughout the country." *Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 361, 72 S.Ct. 312, 96 L.Ed. 398 (1952).

FRSA was not created to provide uniformity for the sake of uniformity. The statute's stated purpose is to enhance railroad safety and reduce accidents. 49 U.S.C. § 20101. And allowing safety related suits under FELA will enhance, rather than impede, that purpose. FRSA regulations provide comprehensive minimum safety standards that apply to a broad range of situations. However, a railroad's conduct may comply with those standards, yet still

fall below the level of ordinary care expected of any reasonable person. And at least as to railroad employees, FELA suits serve to ferret out such situations that might otherwise evade the attention of regulators or that are less amenable to uniform, regulatory solutions. This enhances safety by providing additional incentives for railroads to conduct their operations safely. *Cf. POM Wonderful*, 134 S.Ct. at 2238.

■ "When two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." *Id.* In *POM Wonderful*, the Court held that the Federal Food, Drug, and Cosmetic Act and the Lanham Act complemented each other because each had its own scope and purpose. While the former protects public health and safety through detailed regulations, the latter protects commercial interests against unfair competition through private suits. *Id.*

There is, admittedly, a somewhat greater overlap between the scope and purpose of FRSA and FELA than the statutes in *POM Wonderful*. Both are directed to railroad safety. But they approach it from significantly different perspectives. FRSA seeks to enhance safety in "every area of railroad operations," and protects the public as well as railroad workers. 49 U.S.C. § 20101. It does so with national, comprehensive regulatory standards. FELA, by comparison, focuses solely on the safety of railroad workers, and does so through the common law of negligence rather than prohibiting or requiring any specific conduct. Thus, allowing FELA suits "takes advantage of synergies among multiple methods of regulation" and is consistent with "the congressional design to enact two different statutes, each with its own mechanisms to enhance" railroad safety. *See POM Wonderful*, 134 S.Ct. at 2239.

The Court finds it illustrative to compare (1) the effect on FRSA of allowing FELA claims to continue with (2) the effect on FELA of giving FRSA a preclusive effect. Allowing FELA claims to continue is a mixed bag from the perspective of FRSA—it will further safety but at some expense to uniformity. On the other hand, the purpose of FELA is solely to promote the safety of railroad workers, and allowing FRSA to preclude FELA claims would work unmitigated harm on that purpose, by leaving injured workers with no recourse against their employer and insulating broad categories of potentially negligent conduct from any accountability.

That cannot be the effect that Congress intended—certainly not when FRSA contains no mention, whatsoever, of its effect on FELA. When Congress enacted FRSA in 1970, FELA had been in existence for approximately 60 years. *See,* FRSA, Pub.L. No. 91–458, 84 Stat. 971; FELA, Act of Apr. 22, 1908, ch. 149, 35 Stat. 65. The absence of any provision in FRSA addressing its effect on FELA is significant, given that history, and the fact that the statutes have now existed together for 45 years. If Congress had concluded, in light of experience, that FELA suits would interfere with the operation of FRSA, Congress certainly could have enacted a provision addressing the issue during these statutes' 45 years of co-existence. *POM Wonderful*, 134 S.Ct. at 2237.

The Court will not act where Congress has not. The Supreme Court has "cautioned that FELA should not be 'cut down 'by inference or implication.'" *Cowden,* 690 F.3d at 892 (quoting *Urie v. Thompson,* 337 U.S. 163, 189, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)). Instead, the Supreme Court has, over many decades, consistently held that FELA is a "broad remedial statute" with a humanitarian purpose, and it should be given a " 'liberal construction in

order to accomplish [Congress'] objects.'" *Atchison, Topeka and Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 562, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) (quoting *Urie,* 337 U.S. at 180, 69 S.Ct. 1018). "In the wake of this juggernaut of language, consistently iterated and reiterated over the course of seven and one-half decades, it is not hard to figure out who wins the ties and who gets the benefit of the close calls." *CSX Transp., Inc. v. Miller,* 159 Md.App. 123, 858 A.2d 1025, 1038 (2004). In sum, Madden's crossing safety theory is not precluded by FRSA. BNSF may have been in compliance with federal regulations, but if it nonetheless falls below the standard of care expected of a reasonable person, it may be liable under FELA for harm that results.[6]

### B. BNSF's Duty to Train

■ BNSF next argues that Madden's inadequate training theory fails as a matter of law because BNSF has no duty to train its employees how to respond to an impending collision so as to reduce the risk of injury. BNSF contends that because each train collision is different, it would be impractical and ineffective to attempt to educate its employees on how to safely respond to such a wide variety of situations.

■ The Court is not persuaded. "The determination of any question of duty—that is, whether the law imposed upon the defendant the obligation to protect the plaintiff against the consequences which occurred—is a question of law, and is not for the jury." *Fulk v. Illinois Cent. R. Co.,* 22 F.3d 120, 125 (7th Cir.1994). And BNSF's duty under FELA is the same in this respect as in all others: to provide its employees with reasonably safe

working conditions. *See Cowden,* 690 F.3d at 889. In doing so, BNSF must observe the ordinary prudence and sagacity which a reasonable person would use under the same or similar circumstances. *McBride,* 131 S.Ct. at 2643. That ordinary care may include training employees how to avoid or reduce injuries from hazards, including grade crossing collisions. *See Norfolk Southern Ry. Co. v. Zeagler,* 293 Ga. 582, 748 S.E.2d 846, 852–53 (2013). BNSF has identified no "no principled basis for exempting, as a matter of law, grade-crossing collisions from other workplace hazards that railroads must address when providing safety training to their employees as a component of the duty of care established by FELA." *Id.* at 853. BNSF's arguments that any such training would be infeasible or ineffective are better addressed to the remaining elements of Madden's FELA claim: breach, foreseeability, and causation. *Id.* at 852–58.

■ BNSF next argues that Madden has failed to produce sufficient evidence to create a genuine question of fact on both aspects of his collision education theory: failure to train as well as failure to warn Madden of the crossing's allegedly hazardous nature. BNSF contends that Madden has not produced evidence that, if provided with training or a warning, he could have positioned or braced himself in the train cab in a manner which would have reduced his injuries, even in the slightest. The Court has carefully reviewed the record on this point, and finds that, contrary to BNSF's claim, issues of fact preclude summary judgment. Accordingly, these theories of negligence may proceed to the trial.

---

**6.** Nor is the Court persuaded by *Waymire's* concern about inconsistent recoveries for railroad employees under FELA and other plaintiffs bringing state-law claims. *See* 218 F.3d at 776. That risk is non-unique: the relaxed standard of causation under FELA already presents a possibility that in any given case railroad employees may be able to recover under FELA while a plaintiff's state-law claim based on the same negligent conduct fails.

## C. Duty to Coordinate

 BNSF argues that Madden's coordination theory must fail because BNSF has no duty to regulate traffic using public roads at a public crossing. BNSF relies upon *Packard v. Darveau*, 759 F.3d 897 (8th Cir.2014), which stands for the rule that under Nebraska law, the owner of a premises abutting a public way has no duty to control traffic on the public way— at least where the owner had no control over the site where the injury occurred or over the person or instrumentality that caused the injury. *See id.* The *Packard* court, in turn, relied largely upon the reasoning set forth in *Ferreira v. Strack*, 636 A.2d 682, 686–87 (R.I.1994).

In *Ferreira*, several people attending a midnight church service parked their car in a lot located across a highway from the church. *Id.* at 684. As they crossed the street on their way back, two of them were struck by a drunk driver. In the past, the church had requested a police officer be dispatched to control traffic, but the church had not done so on the night of the accident. The *Ferreira* court articulated five principles that justified exempting the church from a duty to control traffic or provide for safe crossing of a public highway:

> First and most importantly, the duty to control traffic has traditionally rested squarely with the government.... Second, the church had no control over the property on which the injury occurred.... Third, the church had no control over the instrumentality causing the injury [the drunk driver].... Fourth, we express concern that if we were to impose a duty upon a landowner to patrol traffic on public ways, the line which would cut off the landowner's liability then becomes nearly impossible to draw. Fifth, the expense of traffic control should be borne by the public at large and not by individual landowners abutting public ways.

*Id.* at 686–87 (internal quotation and citation omitted)

 The Court has no qualms with the reasoning of *Ferreira* and *Packard.* But the Court is not convinced that their holdings apply to the facts of this case. Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Packard*, 759 F.3d at 901; *see also Zeagler*, 748 S.E.2d at 852 n. 4. And the facts in this case are different, in potentially significant ways, from those in *Ferreira* and *Packard.*

First, it is not entirely clear that Madden's theory of negligence would require BNSF to exercise control over or direct vehicular traffic. Instead, as best as the Court can tell, Madden is alleging that BNSF should have worked with Andersons to warn drivers making deliveries to Andersons' site to be careful of the crossing, and to inform them of the alternative, safer crossing with gates, just a few miles away. Second, BNSF is not just any property owner: it does exercise a degree of control over the crossing. And in some circumstances, that means it owes a duty to provide for additional warning devices, such as gates or flashing lights. *See Crewdson v. Burlington N.R. Co.*, 234 Neb. 631, 452 N.W.2d 270, 278 (1990). In other words, BNSF already has a duty to protect the public and the operators of its trains by controlling traffic at its crossings. And it is possible that BNSF could also fulfill that duty by working with a specific entity that it knows will be bringing an increased amount of slow-moving, heavy trucks over one of its crossing.

The Court finds that summary judgment on this theory of relief would not be appropriate. It may be that, at trial, Madden will be unable to persuade the jury that

providing such warnings would be feasible, or that the warnings would have been heeded, or that a reasonable person would have provided such warnings, given the degree of risks involved at the crossing. But these present questions of fact for the jury.

THEREFORE, IT IS ORDERED:

1. BNSF's motion for summary judgment (filing 196) is denied.